**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

ASHIA SYMONE HICKLIN

          Plaintiff,

          vs.

CVS HEALTH CORP., CVS PHARMACY INC.,
CVS 3766 DACULA, L.L.C.

          Defendants.

**Civil Case No.:**

**COMPLAINT**

**Jury Trial Demanded**

Plaintiff Ashia Simone Hicklin, by her attorneys, The Law Office of Christopher Q. Davis, PLLC, alleges upon personal knowledge and information and belief as to other matters, as follows:

**NATURE OF ACTION**

1.     Plaintiff Ashia Simone Hicklin ("Ms. Hicklin" or "Plaintiff") brings this action against her former employer Defendants CVS Health Corp. ("CVS Health"), CVS Pharmacy Inc. ("CVS Pharmacy") and CVS 3766 Dacula LLC ("CVS Dacula," together with CVS Health and CVS Pharmacy, referred to as "CVS") for violations of the Civil Rights Act of 1866, 42 U.S.C. §1981 ("Section 1981").

2.     Ms. Hicklin, just a few months into her employment with CVS, was repeatedly subjected to ignorant discriminatory comments about Ms. Hicklin's race.

3.     After Ms. Hicklin garnered the courage to contact Human Resources ("HR") to complain about the race-based and sexual harassment, CVS refused to give any credence to her complaints [1] .   Instead, CVS conducted a sham investigation, and rather than remedy the

---

[1]      In addition to race-based harassment and disparate treatment, Ms. Hicklin was also subjected to severe and pervasive sexual harassment.  Ms. Hicklin's sexual harassment claims are not actionable under Section 1981 and as

discrimination to which Ms. Hicklin was subjected to, constructively terminated Ms. Hicklin by refusing her transfer request and forcing her to take a nonconsensual and indefinite unpaid leave of absence.

4.      Plaintiff now seeks lost pay and benefits, front pay and benefits, compensatory and punitive damages, statutory penalties, attorneys' fees and costs, as well as declaratory and injunctive relief for violations of Plaintiff's statutory rights and injuries Plaintiff has sustained as a result of Defendants' unlawful employment discrimination based on her race in violation of Section 1981.

## ADMINISTRATIVE PREREQUISITES

5.      Prior to the filing of this Complaint, on December 7, 2020, Ms. Hicklin, filed a complaint with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on her race and sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"). As soon as the EEOC completes its investigation into Ms. Hicklin's complaint and/or issues a Notice of Right to Sue, Ms. Hicklin will seek leave to amend this Complaint to add Title VII claims against CVS.

6.      Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

7.      Plaintiff is an adult citizen of the United States and a resident of the state of Georgia. Plaintiff voluntarily submits herself to jurisdiction in Rhode Island District Court.

8.      Plaintiff was employed by Defendants as a Shift Supervisor from February 2020 to September 2020 when she was constructively discharged.

---

such this Complaint will be amended to include such claims after she is provided a Right to Sue from the EEOC. Nonetheless, Ms. Hicklin will set forth certain factual allegations as to the sexual harassment in order to provide the fullest picture of the discrimination she faced and constructive discharge.

9.     Defendant CVS Health Corporation (previously CVS Corporation or CVS Caremark Corporation) is a Delaware corporation that claims to be the nation's premier healthcare company. This integrated healthcare company owns and operates, through its subsidiaries: Defendant CVS Pharmacy Inc., a retail pharmacy chain, and Defendant CVS 3766 Dacula, LLC, one of the retail pharmacies in CVS Pharmacy Inc.'s chain of pharmacies. CVS Health's headquarters is in Woonsocket, Rhode Island

10.    Defendant CVS Pharmacy Inc. is a Rhode Island corporation with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895.

11.    Defendant CVS 3766 Dacula, LLC, is a Georgia corporation with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895.

12.    The 3 separately identified CVS entities: CVS Health, CVS Pharmacy Inc., and CVS Dacula, were operated as a single enterprise or joint employer of Plaintiff, maintained common management and interrelated operations, and shall hereafter be referenced singularly or together as "CVS" or "Defendants."

13.    At all relevant times, CVS met the definition of Plaintiff's "employer" under any and all applicable statutes.

14.    At all times relevant to this action, Plaintiff was an "employee" of Defendants.

15.    At all times relevant to this action CVS has employed more than 250,000 people working in its stores, pharmacies, distribution centers, clinics, and corporate headquarters.

## JURISDICTION AND VENUE

16.    This Court has original jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under Section 1981, a federal law.

17.     Since Defendants maintain their principal place of business in Rhode Island and are subject to personal jurisdiction in Rhode Island, venue is proper within this district pursuant to 28 U.S.C. § 1391(b)(1) and (c)(2).

18.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## FACTUAL ALLEGATIONS

### Ms. Hicklin's Background and Employment at CVS

19.     Ms. Hicklin is a 30-year-old African-American woman.

20.     Ms. Hicklin was raised in Lancaster, South Carolina.

21.     Ms. Hicklin was hired as a Shift Supervisor in CVS's store in Dacula, Georgia (the "Store" or "CVS Dacula") in or about February 2020.

22.     Ms. Hicklin was hired to work at the Store which is located at 3027 Jim Moore Road, Dracula, GA 30019.

23.     When Plaintiff was hired, there were four (4) retail supervisors including Plaintiff.

24.     Plaintiff was the only black supervisor, the other three (3) were white.[2]

25.     The Operations Manager for the Store was Alexis Hubbert, a white woman.

26.     The Store Manager was Cara Brown, a white woman.

27.      Ms. Hubbert acted as Store Manager when Ms. Brown was not in the Store.

28.     The District Manager was William Andrew Hyde, a white man.

### Ms. Hicklin was Subjected to Extreme and Relentless Race-Based Harassment

29.     In or around June 2020, just a few months into her employment at CVS, Ms. Hicklin was subjected to months of race-based harassment.

---

[2]      One of the other supervisors identified as Cuban.

30.     It was at this time that demonstrations in support of the Black Lives Matter movement continued across the country to protest the death of George Floyd, a black man killed while in Minneapolis police custody on May 25, 2020.

31.     The protests were both a reaction to Floyd's death and an expression of frustration over longstanding concerns about the treatment of black people in the U.S.

32.     Many Americans were using this moment in history to have conversations about race and racial equality; however, for Ms. Hicklin, it was at this time that her colleagues become more emboldened to disparage and harass her because of her race to the point of emotional collapse.

33.     For example, in or around June 2020, Andrea Holt, a white Shift Supervisor, was in the Store's office talking with another employee while completing morning tasks and Ms. Hicklin was also in the office at the time.

34.     Ms. Holt was telling a story about her husband sleeping late, when she said, in sum and substance, "I can't believe this nigger is still in bed."

35.     The Operations Manager, Ms. Hubbert, and a Cashier, Nicolle Cordoba were both in the room when Ms. Holt made these comments.

36.     Ms. Hicklin was shocked, outraged and offended by Ms. Holt's use of the N* word.

37.     Ms. Hicklin immediately told Ms. Holt that she was offended at her use of the N* word and said, in sum and substance, "For you to feel it is okay to say the N* word when I am around, what must you be saying when I am not around?"

38.     Ms. Holt attempted to justify her used the N* word by claiming that it was okay because she grew up around black people.

39.     Ms. Holt's response perpetuated a common justification for racism: the belief that

somehow proximity to blackness immunizes white people from doing racist things.

40.     In the moment, Ms. Hicklin made it perfectly clear that she thought the use of the N* word was both offensive and inappropriate.

41.     Despite having been subject to extreme racial hostility, Ms. Hicklin was made to feel, by the others in the room (all of whom were white), as if she had hurt Ms. Holt's feelings for speaking up about her use of the N* word.

42.     Despite her protest, Plaintiff was continually subject to discriminatory comments and harassment because of her race for months until she was constructively discharged.

43.     By way of example only, multiple Store employees, including other supervisors and the Operations Manager, constantly made derogatory comments about Ms. Hicklin's hair, which the EEOC's Compliance Manual on Race and Color Discrimination has found constitutes discrimination based on race.

44.     Specifically, the EEOC manual protects against "employment discrimination based on a person's physical characteristics associated with race, such as a person's color, ___**hair**___, facial features, height and weight." (emphasis added).

45.     These discriminatory comments included, for example, the Operations Manager asking if Ms. Hicklin's hair was real and a cashier repeatedly asking Ms. Hicklin to take her hair off and show her real hair.

46.     These comments were, at times, made in front of customers, who would respond by telling Ms. Hicklin, "there is nothing wrong with your hair" or "your hair is beautiful."

47.     On another instance a white colleague commented that unlike Ms. Hicklin, she didn't have to "buy" her hair.

48.     In another instance, Ms. Hicklin's colleagues were laughing at her after the hair product in her hair left residue on the wall.

49.     Finally, when Ms. Hicklin's hair would itch, which happened from time to time, she would occasionally have to touch her hair during work, at which time Ms. Holt would say "yeah, just do your black girl pat."

50.     These constant derogatory comments about Ms. Hicklin's hair, a characteristic associated with her race as a black woman, were severe, pervasive and subjectively and objectively offensive.

51.     Notably, Ms. Hicklin wears her hair in styles typical of black women, including braids.  These comments started mostly in the summer of 2020 and continued for the following few months.

52.     In addition to the racist comments about Ms. Hicklin's hair, other employees at the Store, including supervisory-level employees, would often tell racist jokes and make racists comments in front of Ms. Hicklin, or even worse, about Ms. Hicklin.

53.     For instance, one summer day, Ms. Hicklin and other employees were unloading a delivery truck at the Store. Ms. Hicklin was very hot and went inside into the office to take a break from the heat.  Ms. Holt was in the office and the two were speaking about the blazing hot sun on their skin, when Ms. Holt said, that "the reason why you (meaning black people) look darker than us (meaning white people) is because God left you in the oven longer."

54.     Ms. Holt's comment was sickeningly offensive.

55.     Another time Ms. Hicklin overheard two Store associates calling her a "Porch Monkey."

56.     This was an expression she had never heard before, but after looking it up, she

understood it to be a racial slur that characterizes black people as lazy, unintelligent, and having nothing better to do than hang around on their porch.

57.     On another occasion another Shift Supervisor said that Ms. Hicklin was spraying perfume to "cover up the fried chicken and watermelon" smell – playing on an old stereotype of black people.

58.     Another time, Ms. Cordoba, a cashier, questioned where Ms. Hicklin lived, telling her, "You can't live here. There's no black people who live here."

59.     Ms. Hicklin, as the only shift supervisor in the front of the Store, was frequently asked by the Store Manager and other supervisors to follow young black customers around the Store and, "Make sure you keep an eye on them."

60.     This was clearly racial profiling and was only done to black patrons.  Ms. Hicklin found it offensive because she understood that the only reason she was being asked to do this was because she is black.

61.     On top of this, if anything was missing in the Store, Ms. Hicklin was always the first employee questioned, again because she is black.

62.     As a direct and proximate result of the hostile work environment, Ms. Hicklin began seeing a psychotherapist and taking medications to treat her depression and anxiety that was brought on by her work environment.

### Ms. Hicklin was Subjected to Severe and Pervasive Sexual Harassment[3]

63.     In addition to the ongoing harassment based on her race, Ms. Hicklin was also subjected to severely humiliating and pervasive sexual harassment, including being physically

---

[3]     Ms. Hicklin's sexual harassment claims under Title VII will be included in an amended Complaint after she receives a Right to Sue letter from the EEOC; however, she has set forth her factual allegations herein so as to only have to amend her Complaint to include the Cause of Action.

assaulted by a colleague while at work.

64.     Specifically, a cashier named Nicole Cordoba, on multiple occasions, forcibly grabbed Ms. Hicklin's breasts and her buttocks at work.

65.     Ms. Cordoba was also one of the individuals who made racist comments and contributed to the race-based hostile work environment set forth above.

66.     In addition to grabbing Ms. Hicklin's breasts and buttocks, Ms. Cordoba would also pretend to stick her finger in Ms. Hicklin's buttocks and poked her in her buttocks on multiple occasions.

67.     In addition to physically touching Ms. Hicklin in an overtly sexual and inappropriate manner, Ms. Cordoba was also verbally abusive, frequently calling Ms. Hicklin "bitch" or "whore."

68.     The sexual harassment was constant, and Ms. Hicklin repeatedly asked Ms. Cordoba not to touch her; however, Ms. Cordoba would continue to inappropriately brush herself against Ms. Hicklin's breast or put her hand on her buttocks.

69.     On the days that Ms. Cordoba would touch Ms. Hicklin inappropriately, Ms. Hicklin felt so "dirty" that she would get home from work and immediately take a shower, often staying in the shower for an hour scrubbing her skin so hard in order to help feel "clean" again.

70.     In or about July 2020, Ms. Hicklin finally told the Store Manager, in sum and substance, "Nicole keeps touching me inappropriately and keeps calling me a bitch and a whore."

71.     The Store Manager refused to take an incident report, brushed off Ms. Hicklin's complaints, and told Ms. Hicklin that her solution to the sexual harassment was that Ms. Hicklin and Ms. Cordoba should just not speak anymore.

72.     Predictably, this did not remedy the situation and instead made things worse.

73.     After finally gathering the courage to report the sexual harassment to her Store Manager, Ms. Hicklin was than retaliated against by Ms. Cordoba as well as other supervisory employees of CVS.

### Ms. Hicklin Is Retaliated Against and Constructively Discharged Because She Complained About Race-Based Harassment and Sexual Harassment.

74.     After reporting to the Store Manager that Ms. Cordoba was inappropriately touching her, on or about August 14, 2020, Ms. Cordoba accused Ms. Hicklin of taking her AirPods, which she did not take.

75.     At this point, as mentioned above, Ms. Hicklin and Ms. Cordoba had been instructed not to speak with one another after Ms. Hicklin reported to the Store Manager that Ms. Cordoba was sexually harassing her, up to and including, inappropriate physical touching.

76.     Ms. Cordoba harassed Ms. Hicklin about the AirPods even though she knew Ms. Hicklin did not take them, and despite the fact that she was not supposed to be contacting Ms. Hicklin per the Store Manager's directive.

77.     Ms. Cordoba accused Ms. Hicklin of stealing her AirPods in order to provoke her in retaliation for Ms. Hicklin's complaint about discrimination and harassment.

78.     Ms. Hicklin asked Ms. Cordoba to stop texting her about the AirPods, told her that she did not have them, and reminded Ms. Cordoba that they were not supposed to have any contact per the Store Manager's instructions.

79.     Afterwards, Ms. Hicklin informed Ms. Holt (the Operations Manager) that Ms. Cordoba was disregarding the Store Manager's directives, which Ms. Holt brushed off and failed to address.

80.     When Ms. Holt failed to take any action, Ms. Hicklin called the Store Manager directly to inform her about what was going on.

81.     The Store Manager told Ms. Hicklin that she would be reporting the issue to the District Manager, but that Ms. Hicklin should nonetheless show up for work during her next shift.

82.     That night, Ms. Hicklin suffered an emotional collapse triggering latent bipolarity. She attempted suicide and was stopped by her husband who found her in the act.

83.     When she had recovered enough to talk with her husband, she finally revealed that fact that she had suffered months of enduring severe and pervasive sexual and race-based harassment, disclosed to him the discrimination and harassment, including the inappropriate touching, she was subjected to at work.

84.     Two days later, Ms. Hicklin made a request to the Store Manager to be transferred to a different CVS location.

85.     Instead, the Store Manager blamed Ms. Hicklin and told her that despite months of enduring discriminatory treatment based on her race and sex, and after being physically assaulted by a colleague, that Ms. Hicklin was the problem.

86.     Ms. Hicklin had been complaining about the discriminatory treatment for months, including Ms. Cordoba's harassment, and no one did anything to remedy the situation.

87.     In August, after being told that she was the problem, Ms. Hicklin said to the Store Manager, in sum and substance, "I have been sexually assaulted, harassed, dealt with racism, and Andrew [the District Manager] sees me as the problem, I am the victim. I come to work, and I work hard from when I clock in to when I clock out. I opted out of break to make sure I get my job done."

88.     After this, the Store Manager told Ms. Hicklin that the District Manager did not know about any of the discrimination and harassment, despite the fact that Ms. Hicklin had made multiple complaints to her Store Manager.

89.     CVS utterly failed to take any steps to correct or remedy the discrimination and harassment, despite Ms. Hicklin's repeated complaints.

90.     Finally, after complaining to her Store Manager went nowhere, in or about August 2020, Ms. Hicklin contacted CVS's Human Resources Department ("HR") to make a more formal complaint.

91.     In the HR complaint, Ms. Hicklin noted that she was complaining about sexual harassment, racial harassment, and sexual assault.

92.     Specifically, Ms. Hicklin called and complained of sexual harassment, racial harassment and sexual assault to CVS's HR hotline.

93.     After she called in the complaint to CVS's hotline, Ms. Hicklin was contacted by John Mansel, a corporate CVS employee, to investigate her claims.

94.     When Ms. Hicklin spoke to Mr. Mansel he questioned why she did not report the harassment and discrimination when it first started happening and was further trying to discredit her allegations.

95.     Ms. Hicklin was abundantly clear that she **_had_** reported it when it started happening to her Store Manager.

96.     Mr. Mansel then followed up with Ms. Hicklin after speaking with Ms. Cordoba and others during his investigation.  He proceeded to question whether Ms. Hicklin was merely "friends" with Ms. Cordoba and whether it was all just a joke because, according to Ms. Cordoba, the two were "friends" and "just playing."

97.     Ms. Hicklin made it very clear that (i) she and Ms. Cordoba were not friends; and (ii) at no point did Ms. Hicklin believe the discrimination and harassment was a game, she was never "playing," and to suggest otherwise was offensive.

98.     Ms. Hicklin was both subjectively and objectively offended and uncomfortable with the racial discrimination, sexual harassment, and inappropriate physical touching in the workplace.

99.     Ms. Hicklin was then referred to Sheila Whitaker, a Senior Manager of Employee Relations, and repeated what she had told others about the racial discrimination, sexual harassment, and inappropriate physical touching that she was subjected to at the Store.

100.    Ms. Whitaker listened to Ms. Hicklin relay some of the things that has been said to her by her colleagues and said, in sum and substance, "Symone, are you sure you don't use any foul language because you are cursing a lot right now."

101.    Once again, Ms. Hicklin was dismissed by CVS's HR and had her own integrity questioned when she attempted to report the severe and pervasive racial and sexual harassment she was subjected to.

102.    Ms. Hicklin made it perfectly clear to Ms. Whitaker that she was just repeating to her what happened and that the foul language was not her own words, but rather what was said to her by her colleagues at CVS.

103.    Ms. Whitaker ended the conversation by informing Ms. Hicklin that she could not guarantee her a transfer, but that she would pass Ms. Hicklin's case along to Melissa Payne, a Senior Investigator for Employee Relations.

104.    Ms. Payne was assigned to investigate Ms. Hicklin's complaints about racial discrimination and sexual harassment.

105.    Plaintiff did not hear from Ms. Payne. After some time passed, Ms. Hicklin had to follow-up with Ms. Whitaker again because Ms. Payne never contacted her.

106.    While waiting for a response from CVS's HR team investigating her complaints of

discrimination and harassment, Ms. Hicklin's mental health deteriorated further, and Ms. Hicklin's physician recommended that she take time-off from work.

107.   During this time, Ms. Hicklin was in the process of seeking out a psychiatrist in order to diagnose and treat her now compounding mental health conditions.

108.   In fact, Ms. Hicklin's doctor told her that he did not want her going back to work at CVS Dacula store before she was evaluated by a psychiatrist because he was worried about her mental health after months of continued racism, sexual harassment, and physical assault while working there.

109.   After returning from her leave, Ms. Hicklin requested and was denied any accommodations.  In fact, she was instructed by the District Manager that she could no longer use sick days, that she had to take a mandatory unpaid leave of absence, and that she would not be granted a transfer to a different store.

110.   Ms. Hicklin did not want to take a leave of absence; instead, she had requested a transfer to another CVS store in order to avoid the need to take an unpaid leave of absence.  This was categorically denied.

111.   It was at this time, finally, after weeks of waiting, that Ms. Hicklin spoke to Ms. Payne.

112.   Ms. Payne enforced the mandatory leave.  Ms. Payne told Ms. Hicklin that she was not eligible for a paid leave because it was her choice to take medical leave.

113.   Ms. Hicklin explained to Ms. Payne that it was not her choice to take the unpaid medical leave; rather, it was forced upon her when her transfer request was denied.

114.   Ms. Hicklin was ignored and left on an unpaid leave without any prospect for a transfer out of the hostile work environment at the CVS Dacula store or any return to work date.

115.    Effectively, CVS terminated Ms. Hicklin in retaliation for complaining about the discrimination and harassment based on her race and gender.

### Ms. Hicklin Suffers Extreme Emotional Distress as a Direct Result of the Racial Discrimination and Sexual Harassment at CVS

116.    Ultimately, Ms. Hicklin's psychiatrist diagnosed her with PTSD, bipolar disorder and episode, and anxiety brought on because of the discrimination and harassment she faced at work.

117.    Ms. Hicklin was prescribed various medications to combat her diagnosis including, but not limited to, Latuda, which is an anti-depressant for bipolar depression, Clonazepam, which is an anti-anxiety medication, and Zoloft to help with panic attacks and other anxiety-related issues, as well as Zofran to prevent nausea related to her anxiety.

118.    Ms. Hicklin also, as a direct result of the discrimination, harassment and retaliation she was subjected to for months, attempted suicide.

119.    Ms. Hicklin's suicide attempt was thwarted by her husband who came home early from work that afternoon and was able to prevent tragedy.

120.    Ms. Hicklin has suffered, and continues to suffer, severe emotional distress as a result of Defendants' discriminatory treatment, racial and sexual harassment, and retaliatory firing.

### COUNT I
### Disparate Treatment in Violation of Section 1981
### (Civil Rights Act of 1866, 42 U.S.C.A §1981)

121.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

122.    Plaintiff is a black woman, and as such she a protected class under Section 1981.

123.    Defendants have discriminated against Plaintiff on the basis of her race in violation of Section 1981 by, *inter alia*, denying her the equal terms and conditions of employment, fostering

and condoning a hostile work environment where she was subjected to severe and pervasive discrimination based on her race/color, refusing to provide her a transfer to another store so she no longer had to endure the discrimination, and constructively terminating her employment because of her race when forcing her to take unpaid leave instead of a transfer.

124.    But for Plaintiff's race, she would not have been refused a transfer and she would not have been constructively discharged by placing her on a forced unpaid leave.

125.    Both the Store Manager and the Operations Manager, both of whom exercised managerial/supervisory control over Plaintiff, participated in the discriminatory acts and/or failed to take corrective action when they learned of the discriminatory acts.

126.    Moreover, various other management-level employees certainly knew, or should have known, of the abusive conduct because Plaintiff provided management-level personnel with enough information, notably by complaining of the conduct, to raise a probability that she was being subjected to disparate treatment based on her race.

127.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

128.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including but not limited to, depression, anxiety, sadness, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses, for which she is entitled to an award of damages.

129.    Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

## COUNT II
### Unlawful Harassment in Violation of Section 1981
### (Civil Rights Act of 1866, 42 U.S.C.A §1981)

130.    Plaintiff hereby repeats and re-alleges each and every one of the above-referenced allegations as if fully set forth herein.

131.    Plaintiff is a black woman, and as such she a protected class under Section 1981.

132.    Defendants have discriminated against Plaintiff on the basis of her race in violation of Section 1981 by, *inter alia*, denying her the equal terms and conditions of employment, fostering and condoning a hostile work environment where she was subjected to severe and pervasive discrimination based on her race/color.

133.    But for Plaintiff's race, she would not have been subjected to a workplace that was permeated with highly offensive racist conduct that was significantly pervasive to alter the terms and conditions of her employment and create an abusive and offensive working environment.

134.    For example, Plaintiff was, on a near daily basis, subjected to discriminatory harassment, including but not limited to, constant racist comments knowingly made in her presence, derogatory comments about her hair (a trait associated with her race), being called racist names such as "porch monkey," and much more.

135.    The discriminatory conduct was frequent and severe.

136.    The discriminatory conduct was both objectively and subjectively offensive and humiliating.

137.    The discriminatory conduct interfered with Plaintiff's work performance and impacted the terms and conditions of her employment.

138.    Both the Store Manager and the Operations Manager, both of whom exercised managerial/supervisory control over Plaintiff, participated in the discriminatory acts and/or failed

to take corrective action when they learned of the discriminatory acts.  As such, a specific basis exists for imputing the objectionable conduct to the employer.

139.    Moreover, various other management-level employees certainly knew, or should have known, of the abusive conduct because Plaintiff provided management-level personnel with enough information, notably by complaining of the conduct, to raise a probability that she was being subjected to disparate treatment based on her race. As such, a specific basis exists for imputing the objectionable conduct to the employer.

140.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

141.    As a direct and proximate result of Defendants' unlawful conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including but not limited to, depression, anxiety, sadness, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses, for which she is entitled to an award of damages.

142.    Defendants' unlawful actions constitute malicious, willful and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

143.    Moreover, various management level employees certainly knew, or should have known, of the abusive conduct because Plaintiff provided management-level personnel with enough information to raise a probability of racial harassment in the mind of a reasonable employer.

## COUNT III
**Retaliation in Violation of Section 1981**
**(Civil Rights Act of 1866, 42 U.S.C.A §1981)**

144.    Plaintiff hereby repeats and re-alleges each and every one of the above-referenced allegations as if fully set forth herein.

145.    Plaintiff is a black woman, and as such she a protected class under Section 1981.

146.    Plaintiff engaged in protective activities under Section 1981 when she complained to Defendants about the hostile work environment that she endured while employed by Defendants because of her race/color on a regular basis.

147.    Shortly after Plaintiff's protected complaints, Defendants retaliated against Plaintiff by, *inter alia*, refusing to provide Plaintiff a transfer out of the CVS store where she was being subjected to severe and pervasive discrimination based on her race/color and constructively discharging her employment for raising concerns about harassment, discrimination, a hostile work environment and disparate treatment in the workplace.

148.    Defendants had no valid business justification for the retaliatory and abusive actions taken against Plaintiff following her engagement in protected activity.

149.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

150.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including but not limited to, depression, anxiety, sadness, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses, for which she is entitled to an award of damages.

151.    Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States;

B.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

C.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her mental anguish and emotional distress, humiliation, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical and mental injuries;

D.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputations and loss of career fulfillment;

E.    An award of punitive damages;

F.    An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

G.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Respectfully submitted,

THE LAW OFFICE OF
CHRISTOPHER Q. DAVIS, PLLC

Dated: April 2, 2021                    By:/s/ Christopher Q. Davis
                                        Christopher Q. Davis
                                        Pro Hac Vice Application Forthcoming
                                        Rachel M. Haskell
                                        Pro Hac Vice Application Forthcoming
                                        80 Broad Street, Suite 703
                                        New York, NY 10004
                                        Phone: (646) 430- 7930
                                        Fax: (646) 349-2504
                                        cdavis@workingsolutionsnyc.com
                                        rhaskell@workingsolutionsnyc.com

                                        *Counsel for Plaintiff*

                                        FORMISANO AND COMPANY

Dated: April 2, 2021                    By: /s/ V. Edward Formsaino
                                        V. Edward Formisano, Esq. (#5512)
                                        100 Midway Place, Suite 1
                                        Cranston, RI  02920
                                        Phone: (401) 944-9691, Ext 115
                                        Fax: (401) 944-9695
                                        edf@formisanoandcompany.com